UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MELISSA STITZ,

        Plaintiff,

        v.                                Case No. 21-C-958

AMERICAN FAMILY MUTUAL
INSURANCE COMPANY, S.I.,

        Defendant.

## DECISION AND ORDER GRANTING DEFENDANT'S
## MOTION TO DISMISS HOSTILE WORK ENVIRONMENT CLAIM

      Plaintiff Melissa Stitz brought this action against Defendant American Family Mutual Insurance Company, S.I., alleging gender discrimination, retaliation, and hostile work environment, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. Before the Court is American Family's motion to dismiss the hostile work environment claim. For the following reasons, the motion will be granted.

## LEGAL STANDARD

      A motion to dismiss for failure to state a claim tests the sufficiency of the complaint. Rule 8 requires a pleading to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court raised the standard for meeting this requirement in an effort to limit the rising costs of litigation. Though the Court recognized in *Twombly* the need for caution before dismissing a case at the pleading stage before

discovery has begun, it noted that "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." 550 U.S. at 558 (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528 n.17 (1983)). The Court therefore held that it was not enough to allege the mere possibility of a claim.

"The pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Twombly*, 550 U.S. at 555 ("[A] formulaic recitation of the elements of a cause of action will not do."). A complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 556. "[T]he complaint's allegations must be enough to raise a right to relief above the speculative level." *Id*. at 555 (internal quotations omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). And "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has not shown that the plaintiff is entitled to relief. *Id.*

## ALLEGATIONS IN THE COMPLAINT

According to the complaint, Plaintiff was hired by American Family in 1999 as an insurance agent. Compl. ¶ 10, Dkt. No. 1. In 2006, American Family promoted Plaintiff to a district manager position in Iowa, and in 2008, American Family "gave [Plaintiff] a job as a District Manager for District 23 in Wisconsin East," which is supposedly "one of American Family's most important regions for sales and profits." *Id.* at ¶¶ 11–13. In 2018, American Family hired Tyrone Knight as the "Wisconsin East Sales Director," making Knight Plaintiff's direct supervisor. *Id.* at ¶ 21. Although Knight rated Plaintiff as "outstanding" for her 2018 year-end annual performance review and "as expected" for her 2019 mid-year performance review, things allegedly began to deteriorate from there. *Id.* at ¶ 23.

After an agent in Plaintiff's district mentioned that it would be nice to meet the new sales director (Knight), Plaintiff and Knight scheduled a joint tour of the district from November 18–22, 2019. *Id.* at ¶¶ 26–27. While on the tour, as Plaintiff and Knight were driving from one location to the next, Knight allegedly told Plaintiff that "if she ever complained to anyone above him, she would lose her job." *Id.* at ¶ 28. Knight also told Plaintiff during the drive that "he already had a thick HR file, and that having a thick HR file was the sign of a good leader." *Id.* Knight allegedly went on to claim that "women are too soft in leadership" and that "men are better at laying the hammer." *Id.* at ¶ 31. Plaintiff alleges that Knight's comments worried her at the time. *Id.* at ¶¶ 29, 33.

Knight allegedly made other inappropriate comments throughout the time-period in question. Six months earlier, on May 30, 2019, during a business dinner, Knight allegedly asked Plaintiff and other women at the table "whether they pee in the shower." *Id.* at ¶ 65. Plaintiff asserts that there was no business-related reason for this question and that she did not raise it as a

topic of discussion. *Id.* And then in April 2020, some six months after their tour of the district, Knight held a Zoom meeting in which Knight started the meeting by saying that he was "lining up all the crying women" who contacted him "crying about COVID-19." *Id.* at ¶ 48. He also allegedly stated that it was a "good thing we only have a few more women on the team." *Id.*

Plaintiff also alleges that Knight repeatedly denied her opportunities for professional development. According to the complaint, Plaintiff requested Knight's approval to attend a professional development training called "HeartCore." *Id.* at ¶ 35. When an American Family Vice President agreed to support Plaintiff's attendance at the training, the VP scheduled two meetings with Knight to discuss the opportunity; Knight, however, did not attend either meeting and offered no explanation for his failure to appear. *Id.* at ¶¶ 36–38. Taking matters into her own hands, Plaintiff emailed Knight and asked for his approval regarding the training opportunity. *Id.* at ¶ 39. Knight allegedly responded by telling Plaintiff, "I haven't attended this even yet," and denied Plaintiff's request to attend the training. *Id.* at ¶ 40. This continued with other trainings as well, with Knight allegedly informing Plaintiff that "American Family did not have the financial resources to pay for her to attend" a Lean Six Sigma training. *Id.* at ¶¶ 42–44. After talking to the same American Family state sales director who suggested Plaintiff hire an attorney, Plaintiff learned that "American Family had a budget surplus" and that "American Family's Chief Executive Officer places an importance on professional development." *Id.* at ¶ 46.

Knight also allegedly took actions that negatively impacted Plaintiff's performance figures. In February 2020, Erica Lemhouse, an American Family agent in Plaintiff's district, notified the company that she would be terminating her agencies, allowing eligible American Family agents the opportunity to take over the agencies. *Id.* at ¶¶ 49–50. Three agents applied to take over the agencies, two from Plaintiff's district and one from a different district, Scott Hood.

4

*Id.* at ¶¶ 52–53. According to Plaintiff, Knight and Hood knew and had worked with each other in the past. *Id.* at ¶ 55. Knight allegedly "worked hard to influence the outcome" of the selection process in favor of Hood by "dismissing critiques of Hood and by advocating for him, arguing against objections from [Plaintiff] that having a local agent service local policyholders was better than having an agent who worked over 120 miles away and was unfamiliar with the community." *Id.* at ¶ 59. Ultimately, Knight selected Hood to receive the Lemhouse agencies. *Id.* at ¶ 60. Plaintiff claims that Knight knew selecting Hood, who worked in a different district than Plaintiff, would have adverse financial and job performance consequences for her because the transfer meant 5,210 policies and $3,116,339.68 in premiums would be transferred out of Plaintiff's district. *Id.* at ¶¶ 61–62. The transfer benefitted Todd Duval, the sales district leader for district 30 and, allegedly, a friend of Knight. *Id.* at ¶ 63.

Sufficiently disturbed with these incidents, Plaintiff emailed an American Family HR employee, Coreen Oradei, to discuss Knight's conduct. *Id.* at ¶ 66. Oradei, it is alleged, was not helpful. She allegedly responded to Plaintiff's concerns by "defending Knight, either offering an excuse for each incident of Knight's conduct and discrimination or by simply disregarding" Plaintiff's complaint. *Id.* at ¶ 74. Plaintiff asserts that she later learned that Oradei and Knight "were close and had frequent conversations." *Id.* at ¶ 78. Troubled by Oradei's defense of Knight and their supposedly close relationship, Plaintiff emailed two additional HR employees, Carey Spink and Alex Arriola to request a new HR contact to handle her concerns. *Id.* at ¶¶ 80–81. Spink replied and told Plaintiff that someone would be in touch, but also allegedly emailed Knight, informing him that Plaintiff had contacted HR about him. *Id.* at ¶¶ 82–83.

An American Family employee relations consultant, Angela Freedman, then contacted Plaintiff. *Id.* at ¶ 84. Freedman was more responsive to Plaintiff's concerns, meeting with Plaintiff

5

Case 1:21-cv-00958-WCG   Filed 02/14/22   Page 5 of 11   Document 21

on multiple occasions and discussing her concerns with Oradei's handling of the complaint. *Id.* at ¶¶ 89–91. While Freedman and Plaintiff were communicating over the course of multiple days, Knight scheduled two meetings with Plaintiff, both of which Plaintiff declined to attend based on the fear of retaliation. *Id.* at ¶¶ 93–94. Plaintiff then received notice of her mid-year performance review that was to be held in June and July and conducted by Knight. *Id.* at ¶ 96. She informed Freedman that she preferred to have someone other than Knight conduct her review and Freedman agreed, informing Plaintiff that she would tell Knight. *Id.* at ¶ 97. Nonetheless, Plaintiff received an invitation for her mid-year performance review that Knight would preside over, which, based on her discussion with Freedman, Plaintiff declined to attend. *Id.* at ¶ 98.

Stephanie Carlson, American Family's employee relations director, took over for Freedman regarding Plaintiff's complaint. Carlson initiated a meeting with Plaintiff on July 20, 2020, at which Plaintiff questioned whether Knight treated her differently because of her gender. *Id.* at ¶¶ 105–06. Carlson arranged a meeting, that she would mediate, between Plaintiff, Knight, and Michael Riggs, Knight's supervisor. *Id.* at ¶¶ 108, 110. However, on July 21, 2020, that meeting was cancelled without explanation, and on July 22, 2020, Carlson and Knight terminated Plaintiff for "insubordination." *Id.* at ¶ 114. Pertinent to the motion at issue, Plaintiff alleges that "American Family violated [her] rights when it subjected her to unwelcome harassment, including termination, because of her gender, that was sufficiently severe and pervasive to alter the conditions of her employment, such that it created an abusive relationship." *Id.* at ¶ 132. American Family has moved to dismiss this hostile work environment claim.

## ANALYSIS

To state a Title VII hostile work environment claim in this context, Plaintiff must allege: (1) she was subject to unwelcome harassment; (2) the harassment was based on her gender; (3) the

6

harassment was severe or pervasive "so as to alter the conditions of employment and create a hostile or abusive working environment;" and (4) there is a basis for employer liability. *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 833–34 (7th Cir. 2015) (citing *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004)). In determining whether an actionable hostile work environment claim exists, the Court is to look at "all circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (internal quotations and citations omitted).

Title VII, however, is not a "general civility code" and courts will not find liability based on the "sporadic use of abusive language." *Ford v. Minteq Shapes & Servs., Inc.*, 587 F.3d 845, 848 (7th Cir. 2009) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)); *see also Ngeunjuntr v. Metro. Life Ins. Co.*, 146 F.3d 464, 467 (7th Cir. 1998) ("[I]solated and innocuous incidents will not support a hostile environment claim."). "To rise to the level of a hostile work environment, conduct must be sufficiently severe or pervasive to alter the conditions of employment such that it creates an *abusive* relationship." *Huri*, 804 F.3d at 834 (citing *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014)) (emphasis in original). And although "a workplace need not be 'hellish' to constitute a hostile work environment, *Jackson v. Cty. of Racine*, 474 F.3d 493, 500 (7th Cir. 2007), a hostile work environment must be "so pervaded by discrimination that the terms and conditions of employment [a]re altered." *Alamo v. Bliss*, 864 F.3d 541, 550 (7th Cir. 2017) (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013)) (alteration in original).

American Family argues that Plaintiff's hostile work environment claim is not plausible. It asserts that Plaintiff has only provided three comments, offered over the course of thirteen months, in support of her claim: (1) Knight's comment that "women are too soft in leadership and men are better at laying the hammer;" (2) Knight's comment that he was "lining up all the crying women" and that it was a "good thing we only have a few more women on the team;" and (3) Knight's comment during a business trip, asking women at the table "whether they pee in the shower." Compl. ¶¶ 31, 48, 65. American Family asserts that these comments are "only barely suggestive of sex discrimination" and that they "do not constitute sex-based harassment so severe or pervasive to alter the conditions of employment and create an *abusive* relationship." Dkt. No. 8 at 5. Plaintiff argues that she has alleged sufficient facts to state a plausible claim, pointing both to the statements described above and to additional allegations set forth in the complaint, such as the allegations that Knight denied her professional development opportunities and removed $3,000,000 in premiums from her district. Dkt. No. 11 at 3. American Family counters, arguing that the additional allegations pointed to by Plaintiff should not be considered by the Court in evaluating her hostile work environment claim because they are "standalone disparate treatment claims based on discrete acts" and, as a result, are separate from her hostile work environment claim. Dkt. No. 17 at 2–3; *see also Morgan*, 536 U.S. at 115 ("Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct . . . . The 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.").

As an initial matter, the Court is to consider "the totality of the circumstances" surrounding Plaintiff's hostile work environment claim. *Hall v. City of Chicago*, 713 F.3d 325, 331 (7th Cir.

2013) (citing *Faragher*, 524 U.S. at 787). This includes the allegations that Knight denied Plaintiff professional development opportunities and removed approximately $3,000,000 in premiums from her district. American Family's reliance on *Morgan* does not suggest otherwise. The Supreme Court clarified *Morgan*'s holding in *Green v. Brennan*, where it noted that "a hostile-work-environment claim is a single 'unlawful employment practice' that includes every act composing that claim, whether those acts are independently actionable or not." 578 U.S. 547, 557 (2016); *see also Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 222 (4th Cir. 2016) (holding that the district court erred when it concluded that discrete acts, such as termination and failure to promote, could not be considered part of a hostile work environment claim because each discrete act was separately actionable).

Recall that the Court is to consider the "frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Morgan*, 536 U.S. at 116. Beginning with frequency, the allegations in the complaint reveal that the harassment encountered by Plaintiff was infrequent. Over the course of thirteen months, Plaintiff identifies just three situations in which Knight made inappropriate comments and points to two occasions in which he denied her professional development opportunities. There are no allegations that Knight or anyone else at American Family made any sexual advances or engaged in any improper behavior directed toward Plaintiff. None of the statements allegedly made by Knight referred to women generally or Plaintiff in particular using demeaning and degrading names. On neither of the latter occasions did Knight make any remark suggesting that denying Plaintiff's request was due to her gender. The same is true with respect to Knight's decision to select Hood, as opposed to one of the agents in Plaintiff's district, to take over the Lemhouse agencies. While Plaintiff may not have

9

been pleased with Knight's decisions, neither alone nor in combination can they be said to represent severe or pervasive harassment. We are thus left with the three statements allegedly made by Knight about women.

It is true that there is no "magic number" of instances to establish the existence of a hostile work environment, *Alamo*, 864 F.3d at 550, but three instances over the course of a year does not strike the Court as "pervasive" such that it served to alter the conditions of employment or created an abusive relationship. *Huri*, 804 F.3d at 834; *cf. Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 786 (7th Cir. 2007) (holding that eighteen sex-based comments made over a ten-month period was pervasive); *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (holding that eight gender-based comments over the term of the plaintiff's employment was not pervasive).

This is not fatal, however, because the pervasiveness and severity of the language used are "inversely related," such that a "severe episode that occurs as rarely as once . . . may violate Title VII." *Alamo*, 864 F.3d at 550 (citing *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 951 (7th Cir. 2005)) (internal quotations omitted). Knight's comments and actions, however, do not rise to the level of severity required by Title VII. Knight's comment that "women are too soft in leadership and men are better at laying the hammer," Compl. ¶ 31, may have been inappropriate and involved an ignorant stereotype of women, but this was not the type of comment that "render[s] a workplace unworkable." *Ezell v. Potter*, 400 F.3d 1041, 1048 (7th Cir. 2005). The same is true of Knight's behavior at a meeting in which he stated that he was "lining up all the crying women" who were "crying about COVID-19" and that it was "a good thing we only have a few more women on the team." Compl. ¶ 48. Knight's comments were doubtlessly inappropriate and misplaced, especially given the uncertainty surrounding the world at the time the comments were made, but they were not so severe as to create an abusive relationship. Finally, Knight asking whether women at his

dinner table "pee in the shower," if true, reflects boorish behavior but not the kind of severe or pervasive conduct that would create a hostile work environment. *Id.* at ¶ 65. Taken together, these comments, if made by Knight, were inappropriate and misguided but are closer to "mere offensive utterance[s]" than they are to severe, actionable comments under Title VII. *Morgan*, 536 U.S. at 116.

In sum, Plaintiff has failed to plead facts that plausibly state a claim for a hostile work environment "so pervaded by discrimination that [her] terms and conditions of employment [were] altered." *Alamo*, 864 F.3d at 550 (quoting *Vance*, 570 U.S. at 427). American Family's motion to dismiss that claim will therefore be granted.

## CONCLUSION

For the foregoing reasons, American Family's partial motion to dismiss (Dkt. No. 7) is **GRANTED**. Plaintiff has failed to plead sufficient facts to plausibly establish the existence of a hostile work environment. Therefore, Count III of Plaintiff's complaint is dismissed. Plaintiff's remaining claims will, of course, proceed.

**SO ORDERED** at Green Bay, Wisconsin this 14th day of February, 2022.

s/ William C. Griesbach
William C. Griesbach
United States District Judge